## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

KAREN R. VANDER-MEULEN
        Plaintiff,

vs.                              CASE NO: 2:06-cv-376- JES-SPC

MICHAEL J. ASTRUE,[1]
Commissioner of Social Security,
               Defendant.

_____

### REPORT AND RECOMMENDATION[2]

_____This matter comes before the Court on the Plaintiff, Karen R. Vander-Meulen's Complaint Seeking Review of the Final Decision of the Commissioner of Social Security (Commissioner) denying the Plaintiff's Claim for Disability Insurance (Doc. # 1) filed on July 27, 2006.  The Plaintiff filed her Memorandum of Law in Support of the Complaint (Doc. #14) on January 29, 2007.   The Commissioner filed a Memorandum of Law in Support of the Commissioner's Decision. (Doc. #15) on February 27, 2007.  Thus, the Motion is now ripe for review.

The Undersigned has reviewed the record, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and administrative record, and the pleadings and memoranda submitted by the parties in this case.

### FACTS

_____

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007.  Pursuant to Rule 25(d)(1), the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted for Jo Anne B. Barnhart as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2]This Report and Recommendation addresses only the issues brought up for review by the District Court pursuant to 28 U.S.C. § 405(g).

*Procedural History*

On August 8, 2002, the Plaintiff filed an application for Disability Insurance Benefits alleging an onset disability date of January 5, 2002. (Tr. 92-95). The application was denied initially and upon reconsideration. (Tr. 18). The Plaintiff timely filed a Request for Hearing before an Administrative Law Judge (ALJ). (Tr. 80-81). On April 27, 2005, the Plaintiff appeared and testified at a hearing held before the Honorable Richard E. Ouellette in Fort Myers, Florida. (Tr. 38-69). On October 27, 2005, the ALJ issued an unfavorable decision. (Tr. 18-30). The Plaintiff timely filed a request for review by the Appeals Council. (Tr. 9). The Appeals Council subsequently denied the Plaintiff's request on May 30, 2006. (Tr. 5-7). Having exhausted all administrative remedies, the Plaintiff timely filed a Complaint with this Court.

*Plaintiff's History*

The Plaintiff was born on July 11, 1962, and was forty-three (43) years of age at the time of the hearing and forty-two (42) on the alleged onset date of disability. (Tr. 19). The Plaintiff has a high school equivalency education and some additional college preparatory classes. (Tr. 19). The Plaintiff has a past relevant work history as a waitress, optometrist assistant, appointment clerk, medical secretary, receptionist, inventory control clerk, and title clerk. (Tr. 19). The Plaintiff's alleged impairments include fibromyalgia, memory lapses, severe fatigue, severe pain, mood surges, diabetes, depression, and high blood pressure. (Tr. 19).

*Medical and Psychological History*

The medical record shows the Plaintiff began seeing Richard Bloy, M.D., FACOG, as early as 1990, through January 2003. (Tr. 304-353, 339, 341). Dr. Bloy treated the Plaintiff for yearly gynecological examinations, chronic pelvic pain, endometriosis, infertility, and a subsequent

2

pregnancy. (Tr. 304-353). On December 21, 2000, the plaintiff presented for her yearly exam. Dr. Bloy stated the Plaintiff had a difficult year. (Tr. 316). She had been diagnosed with an autoimmune disease and already had diabetes mellitus, hypertension, and high cholesterol. (Tr. 316). The Plaintiff also tested positive for the Epstein-Barr virus and CMV. (Tr. 316).

On September 27, 2000, the Plaintiff presented to Victor H. Gregory, DO, of the Radiology Regional Center, for an abdominal ultrasound and a retroperitoneal ultrasound. (Tr. 222). Test results revealed the Plaintiff's gallbladder contained a solitary 6mm mobile calcification. (Tr. 222). The gallbladder was not enlarged. (Tr. 222). The liver showed mild enlargement to 18 cm and increased echogenicity indicating fatty infiltration. The common bile duct measured 4 mm. (Tr. 222) The spleen was normal in size, shape, and echogenicity. (Tr. 222). The diagnosis was a solitary gallbladder calculus and an enlarged fatty liver. (Tr. 222). Other than the incompletely visualized pancreas, the retroperitoneal ultrasound was normal. (Tr. 222).

On November 9, 2000, the Plaintiff presented to Dr. John L. Cossu. (Tr. 234-235). Test results showed the Plaintiff was positive ANA with a nucleolar pattern suggestive of possible Nuclear Systemic Sclerosis (PSS) or Scleroderma. (Tr. 234). Testing for Extractable Nuclear Antigen (ENA) antibodies was suggested for future diagnostic evaluation. (Tr. 234).

The medical evidence showed the Plaintiff was first diagnosed with fibromyalgia-type symptomatology with multiple tender points on December 22, 2000. (Tr. 188). There were no areas of active inflammation. (Tr. 188). The Plaintiff had underlying diabetes and lipidemia. (Tr. 188). The Plaintiff complained of fatigue, leg pain, insomnia, polymyalgia, cognitive dysfunction, and night sweats. (Tr. 188). The Plaintiff had a negative rheumatoid factor and normal CBC. (Tr. 188).

On February 13, 2001, the Plaintiff presented to John Lauris Wade, MD, of the Radiology

3

Regional Center, for a chest x-ray. (Tr. 221). The Plaintiff was complaining of cough, congestion, and a history of pneumonia and bronchitis. (Tr. 221). The diaphragm was sharp and the angles were clear. (Tr. 221). The heart size was normal, and the trachea was midline. (Tr. 221). The Plaintiff showed degenerative changes of the spine. (Tr. 221). Dr. Wade's impression was no evident confluent infiltrate, degenerative changes of the spine, and mild hilar prominence, likely due to the Plaintiff's vascular structures. (Tr. 221).

On February 20, 2001, the Plaintiff presented to Dr. Bloy for treatment of fibromyalgia. (Tr. 314). Dr. Bloy opined the Plaintiff definitely had immune complexes on the back. (Tr. 314). The Plaintiff had arthritic joint symptoms and could not move her arm on the right side. (Tr. 314). The Plaintiff complained of decreased mobility when elevating her arm through the back. Dr. Bloy considered treatment with Glutathione for the fibromyalgia and fatigue. (Tr. 314). Dr. Bloy began IV Glutathione treatments on March 26, 2001. (Tr. 313). On April 17, 2001, the Plaintiff was still complaining of moderate to severe back pain and upper neck pain. Dr. Bloy suggested Oxycontin at 10 mg. (Tr. 313). The Plaintiff was prescribed Oxycontin to be taken at 8AM and 8PM. (Tr. 313).

On July 23, 2001, the Plaintiff reported doing very well on the Glutathione and Oxycontin. (Tr. 311). The Plaintiff also noted marked improvement with the Esclim patches. (Tr. 311). The Plaintiff reported taking a few days off the Glutathione and experienced a marked amount of leg cramping and pain in the low back. (Tr. 311). The pain subsided when the treatments were re-initiated. (Tr. 313).

On September 18, 2001, the Plaintiff called to request a refill of the Oxycontin. (Tr. 311). The Plaintiff stated that she needed another prescription because she dropped the bottle while at the sink. (Tr. 311). Approximately thirty-six (36) pills were lost in the soapy water. (Tr. 311). The

Plaintiff continued to receive treatment three times weekly.  (Tr. 311).

On January 11, 2002, the Plaintiff presented to the Lee Memorial Hospital emergency room with the sudden onset of epigastric pain.  (Tr. 235-239).   The Plaintiff stated she often became nauseated and disphoretic.  (Tr. 238).   There was no chest pressure, tightness, squeezing, heaviness, palpitations, or loss of consciousness.  (Tr. 238).   Upon examination, there was tenderness with no rebound, rigidity, guarding, and no CVA tenderness.  (Tr. 238).   There was no palpable mass or abdominal bruit.  (Tr. 238).  The Plaintiff was treated with medication.  (Tr. 239).  The Plaintiff also underwent an ultrasound of the gallbladder and the results revealed no evidence of acute inflammation and there was a polyp.  (Tr. 239).   The Plaintiff was referred back to her primary physician.  (Tr. 239).

On March 21, 2002, Dr. Bloy referred the Plaintiff for pain management.  (Tr. 307).   On April 30, 2002, the Plaintiff presented to Dr. Wayne Isaacson of Acute, Chronic & Cancer Pain Management.  (Tr. 249). The Plaintiff's chief complaint was "total body pain".  (Tr. 249).  She had a secondary complaint of posterior cervical pain radiating into her right shoulder and a tertiary complaint of chronic lower back pain radiating into her right hip, buttock and right lower extremity greater than left lower extremity.  (Tr. 249).   The Plaintiff stated she had an outbreak of shingles in 1989 and the pain has increased ever since.  (Tr. 249). The Plaintiff described her pain as a 9/10 while sitting 90 degrees upright and increased to a 10/10 with standing.  (Tr. 249).   Upon examination, the Plaintiff appeared alert, oriented times three, and in no acute distress.  (Tr. 251).   There was no evidence of adenopathy or thyromegaly.  (Tr. 251).   Examination of the back revealed that the Plaintiff had good heel-to-toe walking and normal gait.  (Tr. 251).   There was evidence of significant paravertebral cervical myofascial involvement.   There was reproduction of pain with cervical

hyperextension, lateral was essentially unlimited.  (Tr. 251).   There was a moderate component of cervical facet joint overlay, primarily right-sided.  (Tr. 251).   There was minimal low thoracic myofascial overlay.  (Tr. 251).  Dr. Issacson reviewed the cervical spine film from 2/5/2002,  a rheumatology evaluation by two other doctors and miscellaneous notes from Dr. Guzman.  (Tr. 251). Based upon the examination and the supplemental medical record, Dr. Issacson's  impression was cervicalgia, lumbago, myofascial overlay, obesity, likely overlying depression and narcotic tolerance. (Tr. 251).  Dr. Issacson discussed treatment options with the Plaintiff and began a series of trigger point injections.  (Tr. 252-253).

On May 2, 2002, the Plaintiff underwent an MRI of the cervical spine.  (Tr. 254).  Results showed the posterior fossa structures and spinal cord were normal.  (Tr. 254).  There was normal alignment of the vertebral bodies. The vertebral bodies heights and intervertebral disc spaces were well-preserved.  (Tr. 254).  There was no prevertebral soft tissue mass or lymphadenopathy.  (Tr. 254).  The impression was mild left foraminal stenosis at C6-C7 due to minimal osteophytic process extending from the left joint of Luschka and muscle spasm with straightening of the normal lordotic curvature of the cervical spine.  (Tr. 255).

In June 2002, the Plaintiff began treatment with Mary Stegman, M.D., of Cypress Pain Management and Palliative Medicine.  (Tr. 454-458).   The Plaintiff was treated by Dr. Stegman through August 2004.  Initially, the Plaintiff's chief complaint was severe pain due to fibromyalgia. (Tr. 454).  Upon examination, Dr. Stegman opined the Plaintiff had fairly typical fibromyalgia.  (Tr. 456).   The initial diagnosis was fibromyalgia, chronic fatigue syndrome, endometritis chronic, headache, restless legs syndrome, depression, tobacco abuse.  (Tr. 456).  Dr. Stegman increased the Plaintiff's Oxycontin dosage and made no further changes.  (Tr. 456).  The Plaintiff was to return in

6

four (4) weeks.  (Tr. 456).

On July 11, 2002, the Plaintiff returned to Dr. Stegman.  (Tr. 452).  The Plaintiff reported no positive change in pain management.  (Tr. 452).  The Plaintiff complained of more leg pain and described the pain as a ball behind her knees.  (Tr. 452).  Dr. Stegman opined the Plaintiff may not be able to work from the emotional as well as the physical point of view.  (Tr. 452).  Dr. Stegman increased the Plaintiff's Oxycontin dosage again and scheduled an MRI of her bilateral knees.  (Tr. 452).

On October 23, 2002, the Plaintiff presented to the Lee Memorial Emergency Room.  (Tr. 264-266).  The Plaintiff complained of left knee pain.  (Tr. 264).  The Plaintiff underwent an x-ray of the left knee which was read negative for acute pathology.  (Tr. 265).  The Plaintiff was diagnosed with left knee pain and exacerbation of fibromyalgia.  (Tr. 265).  She was given Naproxen for pain, and instructed to avoid weight bearing activities and to follow up with her pain management specialist. (Tr. 265).

On October 30, 2002, the Plaintiff presented for a routine appointment with Dr. Stegman.  (Tr. 444).  The Plaintiff reported feeling the same since her last appointment and experienced sudden acute pain in parts of her lower extremities.  (Tr. 444).  Dr. Stegman prescribed Neurontin and the Plaintiff was to return in four (4) weeks.  (Tr. 444).

On November 14, 2002, the Plaintiff presented to Dr. Joseph J. White, of the Associates in Psychology, upon referral by the Office of Disability Determinations.  (Tr. 270-272).  The Plaintiff presented a flat, depressed affect and cried during most of the interview.  (Tr. 271).  Both judgment and insight were fair and her IQ was estimated to be at the low average range.  (Tr.271).  She was well oriented to time and place, but showed poor attention, concentration, and inadequate short term

memory.  (Tr. 271).  DSM IV diagnosis for Axis I was adjustment disorder with depressed mood. (Tr. 271).  The Plaintiff does light chores, has restless sleep and a poor appetite.  (Tr. 272).  Dr. White stated the Plaintiff's current level of depression is considered to be a barrier to her overall functioning.  (Tr. 272).

On December 27, 2002, the Plaintiff returned to Dr. Stegman for a routine appointment.  (Tr. 440).  Dr. Stegman noted the Plaintiff had the flu but her overall pain was better controlled.  (Tr. 440).  Dr. Stegman also noted the Plaintiff seemed more depressed but was taking Serafin.  (Tr. 440).

On January 13, 2002, the Plaintiff participated in physical therapy.  (Tr. 369).  Treatment notes reflect the Plaintiff underwent physical therapy until May 6, 2003, where it was noted the Plaintiff was feeling better.  (Tr. 361).

On February 10, 2003, Dr. Stegman authored a letter summarizing the Plaintiff's diagnosis and treatment.  (Tr. 435-437).  Dr. Stegman stated the Plaintiff was not able to dress without assistance. (Tr. 436).  The Plaintiff was able to fix a meal and eat unassisted, but notes reflect she could not shower or bath unassisted most of the time.  (Tr. 438).  The Plaintiff complained the pain caused anxiety, depression, stress, lack of concentration, memory loss, sleepiness or inability to sleep. (Tr. 436).  The Plaintiff took several medications related to pain but experienced no side effects.  (Tr. 436).  Dr. Stegman noted the pain changed the Plaintiff's life, that she was miserable all the time and believes she has no life. (Tr. 437).

On June 2, 2003, the Plaintiff presented to Sunil Lalla, M.D., for a general medical examination upon the request of the Agency. (Tr. 370-373).  Dr. Lalla's impression was hypertension under poor control, diabetes mellitus, diabetic neuropathy, tobacco abuse, chronic bronchitis, and chronic obstructive pulmonary disease, chronic fatigue syndrome with associated symptoms,

fibromyalgia, gastroesophgeal reflux disease, constipation secondary to chronic narcotic use, generalized anxiety disorder, arthritis of the back and right knee with pain, memory impairment and gait disturbance. (Tr. 372-373). Muscles were well built with no atrophy. (Tr. 371). Power was found to be 4/5 in both upper and lower extremities and deep tendon reflexes were 2- bilaterally. (Tr. 271). Dr. Lalla noted the Plaintiff ambulated thirty (30) feet without difficulty, used no assistive devices and heel and toe walking was normal. (Tr. 371).

On September 13, 2003, Dr. Paul Miske, Clinical Psychologist, performed a psychodiagnostic evaluation at the request of the Agency. (Tr. 383-384). Dr. Miske opined the Plaintiff appeared to meet DSM IV diagnostic criteria for 296.33 Major Depressive Order, Recurrent without Psychotic Features. (Tr. 384). Dr. Miske offered a guarded prognosis. (Tr. 384). Dr. Miske noted the Plaintiff had been treated with antidepressant medications with minimal treatment response. (Tr. 384). Dr. Miske recommended the Plaintiff be evaluated as soon as possible by a psychiatrist or physician to determine the potential efficacy of introducing an alternative psychotropic mediation. (Tr. 384). Dr. Miske also determined the Plaintiff is capable of managing her own financial affairs and the Plaintiff was fully aware of her financial status which partially relates to her decision to apply for disability benefits. (Tr. 384).

On December 17, 2003, the Plaintiff presented to the Lee Memorial Hospital Emergency Room. (Tr. 404-411). The Plaintiff chief complaint was urticaria, commonly referred to as hives. (Tr. 405). The hives were spread diffusely over the body, mostly on the torso. (Tr. 405). The hives started after the Plaintiff was cleaning an old box that contained a battery and other items. (Tr. 405). CBC and a chemistry panel was normal. (Tr. 406). The Plaintiff received Benadryl, which relieved the itching and Solu-Medrol for her diabetes. (Tr. 406). The Plaintiff was then released. (Tr. 406).

9

On January 12, 2004, the Plaintiff presented to the Lee Memorial Hospital Emergency Room with a chief complaint of knee pain. (Tr. 413). The Plaintiff stated she was making beds and got her leg twisted in the corner of the bed. (Tr. 413). An x-ray taken of the right knee was negative. (Tr. 413). The Plaintiff was given Naprosyn 500 mg and released. (Tr. 414).

On January 16, 2004, the Plaintiff participated in physical therapy with Dr. Douglas A. Merlo of the Chiropractic & Nutrition Center of Florida. (Tr. 546-552). On January 16, 2004, the Plaintiff stated she was in a lot of pain and was experiencing headaches. (Tr. 552). By December 1, 2004, progress notes indicated the Plaintiff was improving and stabilizing. (Tr. 546).

Beginning in July 2004, the Plaintiff began treatment with Dr. Michael Woulas. (Tr. 460-467). On September 14, 2004, Dr. Woulas completed a Mental Residual Functional Capacity Questionnaire. (Tr. 460-464). Dr. Woulas opined the Plaintiff was not impaired of the ability to accept instruction from or respond appropriately to criticism from supervisors or superiors. (Tr. 460). Dr. Woulas estimated a moderate impairment of ability to work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes and in the ability to relate to the general public and maintain socially appropriate behavior. (Tr. 460, 461). Dr. Woulas found the Plaintiff had a mild impairment of ability to respond appropriately to co-workers or peers. (Tr. 461). With respect to sustained concentration and persistence, Dr. Woulas opined the Plaintiff had marked impairments of the ability to perform and complete work tasks in a normal work day or week at a consistent pace; the ability to maintain attention and concentration for more than brief periods of time; and the ability to perform at production levels expected by most employers. (Tr. 461-462), The Plaintiff was found to be moderately impaired in her ability to process subjective information accurately and using appropriate judgment; in her ability to carry through instructions and

complete tasks independently and in her ability to respond appropriately to changes in work settings. (Tr. 461). A mild impairment was found in her ability to remember locations and workday procedures. (Tr. 462). The Plaintiff was found to be markedly impaired in her ability to maintain personal appearance and hygiene and in her ability to tolerate customary work pressures. (Tr. 462). Dr. Woulas concluded that the Plaintiff condition would likely deteriorate if she was placed under stress particularly that of a job. (Tr 463).

On December 13, 2004, Dr. Woulas completed a Fibromyalgia Residual Functional Questionnaire. (Tr. 462). Dr. Woulas found the Plaintiff met the American Rheumatological criteria for fibromyalgia. (Tr. 468). She was also diagnosed with chronic fatigue syndrome. (Tr. 468). Dr. Woulas stated the Plaintiff's prognosis was good and noted symptoms of multiple tender points, non-restorative sleep, chronic fatigue, morning stiffness, subjective swelling, irritable bowel syndrome, depression, vestibular dysfunction, incoordination, numbness and tingling, dysmenorrheal, anxiety, panic attacks, frequent severe headaches, premenstrual syndrome, carpal tunnel syndrome, and chronic fatigue syndrome. (Tr. 468). Dr. Woulas opined the Plaintiff could sit, stand and/or walk less than one (1) hour in an eight (8) hour workday and could walk less than one (1) city block. (Tr. 470). Further, he noted that she could lift and/or carry less than ten (10) pounds and needed two (2) hands to carry a gallon of milk. (Tr. 470). He found the Plaintiff had significant limitations in reaching, handling and fingering. (Tr. 471). He concluded the Plaintiff would likely be absent from work more than three (3) times a month because of her impairments. (Tr. 471).

On September 21, 2004, the Plaintiff presented to Dr. Paul Arnold, DO, of the Cypress Pain Management and Palliative Medicine. (Tr. 565). Dr. Arnold noted the review of symptoms was positive for depression. (Tr. 565). The Plaintiff was prescribed Lithium 300 mg and directed to

return the following week.  (Tr. 565).  Upon return, the Plaintiff's pain level was 50% improved and

her quality of life had improved. (Tr. 567). She was not having any side effects.  (Tr. 567).  Dr.

Arnold stated the review of symptoms was positive for depression, but was responding some to

prescription medication.  (Tr. 567).  Progress notes dated February 15, 2005, indicate pain

management and quality of life is improved.  (Tr. 577).

On March 29, 2005, Dr. Arnold completed a Fibromyalgia Residual Functional Capacity

Questionnaire.  (Tr. 560-564).  Dr. Arnold stated the Plaintiff met the American Rheumatological

criteria for fibromyalgia.  (Tr. 560).  The Plaintiff was also diagnosed with depression and chronic

fatigue.  (Tr. 560).  Dr. Arnold stated the Plaintiff's prognosis was poor and noted symptoms of

chronic fatigue, morning stiffness and depression.  (Tr. 560).  Dr. Arnold opined the Plaintiff was

severely limited in her ability to deal with work stress and could not function in a competitive work

situation.  (Tr. 561, 562).  Dr. Arnold further stated the Plaintiff could carry less than ten (10)

pounds, stand/walk less than two (2) hours in an eight (8) hour workday, and can sit for at least sic

(6) hours in an eight (8) hour workday.  (Tr. 562).  The Plaintiff was not found with limitations in

reaching, handling, or fingering.  (Tr. 563).

### _Administrative Law Judge's Decision_

Upon consideration of the records, the ALJ found that the Plaintiff met the nondisability

requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I)

of the Social Security Act and is insured for benefits through the date of the decision.  (Tr. 29).  The

ALJ determined the Plaintiff has not engaged in substantial gainful activity since the alleged onset of

disability.  (Tr 30).  The ALJ found the Plaintiff's diabetes mellitus, gastroesophgeal reflux disease,

obesity, fibromyalgia, depression, and generalized body pain are considered "severe" based upon the

requirement in the Regulations 20 CFR § 404.1520 (c).  However, the ALJ found the Plaintiff's medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, subpart P, Regulations No. 4.  (Tr. 30).   The ALJ found that the Plaintiff's allegations regarding her limitations are not totally credible. (Tr. 30). The ALJ concluded the Plaintiff has the residual functional capacity to perform sedentary work activity with a sit/stand option with occasional limitations for bending, stooping, crouching and kneeling.  (Tr. 30) The Plaintiff has occasional limitations for prolonged standing.   The Plaintiff further has an occasional limitations for concentration on tasks assigned and coping with work stress, but capable of performing simple, routine, repetitive tasks.  (Tr. 30).  The ALJ further concluded the Plaintiff was unable to return to her past relevant work.  (Tr. 30).  The ALJ determined the Plaintiff was considered a "younger individual" with a "high school (or high school equivalent) education", has no transferable skills from previous work performed as per the vocational testimony.  (Tr. 30).  The Plaintiff was found to retain the residual functional capacity to perform a limited range of sedentary work.  (Tr. 30).  The ALJ found although the Plaintiff's exertional limitations do not allow her to perform the full range of sedentary work, using the Medical -Vocational Rule 201.21 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform.  (Tr. 30). Examples of such jobs include work as an order clerk, telephone quotation clerk and charge account clerk.  (Tr. 30).   Therefore, the ALJ concluded the Plaintiff was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(g)).  (Tr. 30).

## THE STANDARD OF REVIEW

### A.  Affirmance

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards,  McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 28 L. Ed 2d 842 (1971).  In evaluating whether a claimant is disabled, the ALJ must follow the sequential inquiry described in the regulations[3].  See 20 C.F.R. §§ 404.1520(a), 404.920(a).  The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla-*i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); Richardson, 402 U.S. at 401.

---

[3]The inquiry requires the ALJ to engage in a five-step analysis, which will either preclude or mandate a finding of disability.  The steps are as follows:
*Step 1.*  Is the claimant engaged in substantial gainful activity?  If the claimant is engaged in such activity, then he or she is not disabled.  If not, then the ALJ must move on to the next question.
*Step 2.*  Does the claimant suffer from a severe impairment?  If not, then the claimant is not disabled.  If there is a severe impairment, the ALJ moves on to step three.
*Step 3.*  Does the claimant's impairment meet or equal one of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If so, then the claimant is disabled.  If not, the next question must be resolved.
*Step 4.*  Can the claimant perform his or her former work?  If the claimant can perform his or her past relevant work, he or she is not disabled.  If not, the ALJ must answer the last question.
*Step 5.*  Can he or she engage in other work of the sort found in the national economy?  If so, then the claimant is not disabled.  If the claimant cannot engage in other work, then he or she is disabled.  See 20 C.F.R. §§404.1520(a)-(f), 416.920(a)-(f); see also Phillips v. Barnhart, 357 F.3d 1232, 1237-40 (11th Cir. 2004); Foote v. Chater, 67 F.3d 1553, 1557 (11th Cir. 1995) (per curiam).

Where the Commissioner's decision is supported by substantial evidence, the District Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  Edwards v. Sullivan, 937 F.2d 580, 585 n.3 (11th Cir. 1991); Barnes v. Sullivan, 932 F.3d 1356, 1458 (11th Cir. 1991).  The District Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  Foote, 67 F.3d at 1560; Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir 1992) (holding the court must scrutinize the entire record to determine reasonableness of factual findings).

The court  "may not decide the facts anew, reweigh the evidence or substitute it's judgment for that of the [Commissioner]."Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).  If the Commissioner's decision is supported by substantial evidence, it should not be disturbed. Lewis v. Callahan, 125 F. 3d 1436, 1440 (11th Cir. 1997).

## B.  **Reversal and Remand**

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405 (g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. Keeton v. Department of Health and Human Services, 21 F.3d 1064, 1066 (11th Cir. 1994); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner, and order an award of disability benefits, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. Davis

v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993). The district court may also remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences. Jackson v. Chater, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).

To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. Jackson, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); Davis, 985 F.2d at 534 (remand to the Secretary is warranted where the ALJ has failed to apply the correct legal standards). Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. Falcon v. Heckler, 732 F.2d 827, 830 (11th Cir. 1984). (remand was appropriate to allow ALJ to explain the his basis of his decision).

On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence upon a showing that there is new evidence which is material and that there was good cause for the failure to incorporate such evidence into the record during a prior proceeding. Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983)(finding ALJ error and remanding to consider psychiatric evaluation); Reeves v. Heckler, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (remanding on the grounds that it is reversible error for the ALJ not to order a consultative examination when warranted). After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. Jackson, 99 F.3d at1095.

In contrast, a sentence-six remand may be warranted even in the absence of an error by the

Commissioner if new, material evidence becomes available to the claimant. Jackson, 99 F.3d at 1095.

Sentence six of § 405 (g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405 (g) (sentence six). To remand under sentence six, the claimant must establish: 1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. Jackson, 99 F.3d at 1090 - 92; Keeton v. Dept. of Health and Human Serv., 21 F.3d 1064, 1068 (11th Cir. 1994). With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. Jackson, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings. Id.

## THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416 (I), 423 (d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423 (d)(2); 20 C.F.R. §§404.1505 - 404.1511.

## DISCUSSION

The Plaintiff argues the ALJ erred in his decision by (1) failing to afford the appropriate

weight to the Plaintiff's treating physicians;(2) failing to properly consider the Plaintiff mental impairments; (3) failing to apply the requirements of the standard for evaluating pain and credibility in the Eleventh Circuit; and (4) failing to pose an adequate hypothetical question to the vocational expert.  The Defendant counters by stating  the ALJ supported his decision with substantial evidence from the record and applied the correct legal standard.

### (1) Whether the ALJ's RFC Determination is Contrary to the Medical Evidence

The Plaintiff argues the ALJ's determination of the Plaintiff's  RFC was flawed because he did not afford the proper weight to the Plaintiff's treating physicians.  The Plaintiff bears the burden of proving she cannot meet the physical and mental demands of [her] past relevant work, either as [she] performed it in the specific past employment or as the work is generally performed in the national economy.  Paige vs. Apfel, 2001 WL 936198 (S.D. Ala. 2001) (citing Jackson v. Bowen, 801 F.2d 1291, 1293).  The RFC is an assessment which is based upon all the relevant evidence of a claimant's remaining ability to do work despite her impairments. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1545(a)).  The determination of RFC is within the authority of the ALJ and along with the Plaintiff's age, education, and work experience the RFC is considered in determining whether the claimant can work. Lewis, 125 F.3d at1440 (citing 20 C.F.R. § 404.1520(f)).

The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing a claimant's residual functional capacity. 20 C.F.R. §§ 404.1545 and 404.1546.  The ALJ is required to review all the medical findings and other evidence that supports a medical source's statement that a claimant is disabled, nevertheless, it is the ALJ who is responsible for making the ultimate determination about whether a claimant meets the statutory definition of

disability. 20 C.F.R. § 404.1527 (e).

In this instance, the ALJ adequately considered the opinions of the treating physicians in making his RFC determination.  The Plaintiff states she was treated by Dr. Stegman and Dr. Arnold for pain management, and Dr. Woulas for mental impairments. She contends the ALJ failed to discuss what weight he placed on their opinions and further that their opinions were entitled to probative weight.  The Defendant counters by arguing the ALJ may discount a treating physician if unsupported by medical evidence.  The Defendant further argues the treating physicians were properly discounted in the decision, therefore, the RFC was not flawed.

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. 20 C.F.R. § 404.1527 (d); Lewis, 125 F.3d at 1439 - 1441; Sabo v. Commissioner of Social Security, 955 F.Supp. 1456, 1462 (M.D. Fla. 1996). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527 (d)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence, supports a contrary finding, or is wholly conclusory. Edwards v. Sullivan, 937 F.2d 580,  (11th Cir. 1991) (ALJ properly discounted treating Physician's report where the physician was unsure of the accuracy of his findings and statements); Morrison v. Barnhart, 278 F. Supp. 1331, 1334 (M.D. Fla. 2003). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. Schnor v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987); Wheeler v. Heckler, 784 F.2d 1073, 1075

(11th Cir. 1986). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical issues at issue; (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527 (d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. 20 C.F.R. § 404.1527 (d)(2); Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984). Furthermore, should the ALJ discount the treating physician's opinion he must clearly articulate the reasons for giving less weight to the opinion, and failure to do so is reversible error. Morrison, 278 F. Supp. at 1334.

Here, the ALJ discussed the treatment records and opinions of these treating physicians in his decision and found they were  substantially based upon the subjective complaints of the Plaintiff.  The Plaintiff began treatment with Dr. Stegman for pain management from June 13, 2002 through August 4, 2004.  (Tr.423-458).  The ALJ noted although Dr. Stegman wrote the Plaintiff was disabled, her assessment was highly questionable because she wasn't sure of any viable diagnosis.  (Tr. 26).  Dr. Stegman stated in June 2003, the Plaintiff has "typical fibromyalgia, if there is such a thing". (Tr. 26). Upon review, the ALJ concluded  Dr. Stegman's characterization of "typical fibromyalgia" indicates the Plaintiff complained of symptoms associated with fibromyalgia, however, these assertions of subjective pain were highly questionable.  (Tr. 26).

According to the medical record, the Plaintiff came under the care of Dr. Arnold, a pain management specialist, on September 21, 2004.  (Tr. 565-582).   Regarding the opinion of Dr. Arnold, the ALJ noted Dr. Arnold found the Plaintiff's "psychological overlay is gigantic", but points

out the Plaintiff was able to perform all normal activities of daily living without difficulty. (Tr. 26, 575). The ALJ further noted upon examination in December 2004, the Plaintiff's "affect was not significant for depression, anxiety, and agitation" and found the Plaintiff to be non-compliant. (Tr. 26, 573). As a result, Dr. Arnold felt the Plaintiff's medication could be reduced. (Tr. 26).

Regarding the opinion of Dr. Woulas, the ALJ points to a Mental Residual Functional Capacity Questionnaire completed by Dr. Woulas on September 14, 2004. (Tr. 460-463). Dr. Woulas opined the Plaintiff was disabled for mental health reasons. (Tr. 26, 460-463). Subsequently, Dr. Woulas also completed a Fibromyalgia Residual Functional Capacity Questionnaire (Tr. 468-472). Although Dr. Woulas checked a number of symptoms, he also stated her prognosis was good. (Tr. 468). As the ALJ notes, the opinions outlined in the questionnaires are also premised on the Plaintiff's subjective complaints, which the ALJ found not credible.

In making his RFC determination, the ALJ relied upon the objective medical evidence of record. The ALJ found the Plaintiff had the following RFC:

> [T]he claimant retains the residual functional capacity to perform sedentary work activity with a sit/stand option with occasional limitations for bending, stooping, crouching, and kneeling. She has occasional limitations for prolonged standing. She further has an occasional limitations for concentration on tasks assigned and coping with work stress, but capable of performing simple, routine, repetitive tasks. (Tr. 27).

The ALJ found the opinions offered by Dr. Stegman, Dr. Arnold and Dr. Woulas were not supported by objective medical evidence but rather based upon subjective complaints which he found to lack credibility. (Tr. 26). The ALJ found the objective test results basically showed "mild" results. (Tr. 26). The ALJ referred to reports from Dr. Sunil Lalla, a DDS consultant. (Tr. 25, 27). These treatment notes showed that, despite the Plaintiff's claims of disabling pain, the Plaintiff's power in

21

upper extremity was 4/5, fine manual dexterity was normal, and she was able to walk thirty (30) feet without difficulty. (Tr. 27, 370-373). The ALJ having found the Plaintiff's mere allegations to be unsupported by the objective medical evidence demonstrated the requisite good cause to reject the treating physicians opinion in making his RFC determination. Ellison, 355 F.3d at 1276 (citing 20 C.F.R. § 416.912©). Therefore, the ALJ's determination of the Plaintiff's RFC was based upon substantial evidence and in compliance with the requirements of the Regulations.

### (2) Whether the ALJ Properly Afforded the Appropriate Weight to the Examining and Treating Physicians Regarding the Plaintiff's Mental Limitations

The Plaintiff argues the ALJ failed to afford the proper weight to the examining and treating physicians regarding the Plaintiff's mental impairment and thus, erroneously found the Plaintiff to have only an occasional limitation for concentration and coping with work stress. The Defendant argues the ALJ properly discounted the assessments and included the appropriate limitations in the RFC to reflect the Plaintiff's capability.

First, the Plaintiff again refers to Dr. Woulas, the Plaintiff's treating psychiatrist, as well as the opinions of Dr. Stegnam and Dr. Arnold, the pain management specialists. Dr. Woulas opined the Plaintiff suffered from several marked mental limitations in the Mental Residual Functional Capacity Questionnaire. (Tr. 24, 460-463). However, when asked to indicate why the Plaintiff's condition was likely to deteriorate under stress, Dr. Woulas simply stated the Plaintiff was "in pain". (Tr. 24, 463). As noted above, the ALJ adequately discounted Dr. Woulas' assessment in his decision as based upon subjective complaints unsupported by the medical evidence. (Tr. 26).

The ALJ addressed Dr. Stegnam's opinion in his decision finding the opinions highly questionable because she wasn't sure of any viable diagnosis. (Tr. 26). Although Dr. Stegnam wrote

22

the Plaintiff was disabled, the ALJ discounted this opinion noting that these assessments were based upon the subjective complaints of the Plaintiff and not supported by objective medical evidence. (Tr. 26, 425). The ALJ's finding is supported by the evidence in the medical record. Initially, treatment records show the Plaintiff began treatment with medication, including Oxycontin. (Tr. 454-458). Dr. Stegnam treated the Plaintiff's pain which was alleged to have caused the Plaintiff anxiety, depression, stress, lack of concentration, memory loss, sleepiness and inability to sleep. (Tr. 454-458). However, by August 2002, treatment notes indicate that the pain and quality of life had improved. (Tr. 450). Dr. Stegman noted the Plaintiff was laughing more, staying active, and sleeping better. (Tr. 448).

The ALJ also referred to the treating notes from Dr. Isaacson's physical examination. Dr. Isaacson opined the Plaintiff was basically normal and his diagnosis, in part, was myofascial overlay. (Tr. 26). Dr. Isaacson did not prescribe narcotics. (Tr. 26). Instead, Dr. Issacson felt the Plaintiff had a "narcotic tolerance". (Tr. 26). As the ALJ notes, this suggests that the Plaintiff's subjective complaints of pain were influenced in some degree,  by her desire to obtain narcotics.  (Tr. 26). When the Plaintiff was questioned about the incident during the hearing, she denied saying she lost the pills. (Tr. 25). Instead, the Plaintiff stated she  left Dr. Issacson because she did not like his attitude and he refused to treat her. (Tr. 25, 61-62). The Plaintiff disagreed and felt she should be "weaned" off the narcotics. (Tr. 25, 61-62).

In further support of his assessment, the ALJ also discusses evidence from two (2) State Agency consultative psychologists who examined the Plaintiff upon referral from the Office of Disability Determinations. On November 14, 2002, the Plaintiff was examined by Dr. Joseph White. (Tr. 270-272). Dr. White opined that the Plaintiff showed a flat, depressed affect, poor attention,

concentration and inadequate short term memory.  (Tr. 271).  On September 13, 2003, the Plaintiff

was evaluated by Dr. Paul Miske.  (Tr. 383-384).  Dr. Miske opined the Plaintiff was suffering from

Major Depressive Disorder.  (Tr. 384).  However, the ALJ found these opinions only somewhat

persuasive.  (Tr. 28).  The ALJ acknowledged the Plaintiff has a severe mental impairment, however,

he did not find it disabling.  (Tr. 28).  Although Dr. White found the Plaintiff to be impaired, he also

noted the Plaintiff's judgment and insight were fair, she drives her daughter to and from school and

cares for her children.  (Tr. 272). Although Dr. Miske also found impairments, he noted the Plaintiff

reported being functional with her daily living activities and capable of completing tasks around the

home.  (Tr. 384).   Taking these two evaluations into account, Dr. Arthur Hamlin completed a Mental

Residual Functional Capacity Assessment (Tr. 385-401).  Dr. Hamlin found the Plaintiff moderately

limited, however, it was not disabling which suggested that the Plaintiff retained the ability to adjust

to a very simple work environment.  (Tr. 387).  Dr. Hamlin concluded that the Plaintiff has a severe

impairment, but from a mental perspective, she was capable of carrying out simple, repetitive tasks

and can interact adequately with others.  (Tr. 401).   Upon consideration of these opinions the ALJ

concluded the following:

> The State Agency Psychological consultants found the claimant had moderate
> limitations in the activities of daily living, maintaining social functioning and
> maintaining concentration, persistence and pace.  I find that the assessment of the
> State Agency psychological consultants are somewhat persuasive and find that the
> claimant has a severe mental impairment, although it does not appear disabling.
> Therefore, the claimant has occasional limitations for concentration on tasks assigned
> and coping with work stress, but capable of performing simple, routine, repetitive
> tasks. (Tr. 28).

It is clear that the ALJ thoroughly considered the evidence regarding the Plaintiff's mental

impairments.  The ALJ clearly acknowledged the Plaintiff's depression and limitations she experiences

as a result of the depression.  The ALJ also noted the Plaintiff underwent little mental health treatment. (Tr. 26).  The ALJ discussed the medical evidence as it related to the Plaintiff's mental conditions and determined that the medical records did not reflect sufficient support for the Plaintiff's claim of disabling mental impairments. It is perfectly proper for the ALJ to rely upon the State Agency Consultants' opinion because these can be considered expert opinions.  20 C.F.R. § 404.1527(f)(2)(ii).   Since the medical evidence did not support the Plaintiff's mental impairment claim, the ALJ found the Plaintiff was not disabled due to mental impairment. (Tr. 17.)  Because the ALJ supported his mental impairment determination, the RFC assessment was then based upon substantial evidence and that decision should not be disturbed by the Court. Hale, 831 F.2d at 1012.

### (3)Whether the ALJ Failed in Applying the Eleventh Circuit Pain Standard and Credibility

The Plaintiff argues the ALJ failed in properly analyzing the Plaintiff's subjective complaints including pain. The Commissioner argues the ALJ gave proper consideration to the Plaintiff's subjective complaints of pain and the ALJ properly discounted those allegations and her credibility, in accordance with controlling Eleventh Circuit case law.

Pain is a non-exertional impairment. Id. at 1559. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g. medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423 (d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must

apply the Eleventh Circuit's three-part "pain standard." Foote, 67 F.3d at 1560.

The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991). Pain alone can be disabling, even when its existence is unsupported by objective evidence, Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423 (d)(5)(A).

In making his assessment, the ALJ indicated he must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 CFR § 404.1529, and Social Security Ruling 96-7p.  The ALJ must also consider any medical opinions, which are statements from acceptable medical sources which reflect judgments about the nature and severity of the impairments and resulting limitations. (20 CFR § a404.1527 and Social Security Rulings 96-2p and 96-6p). (Tr. 14).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d at 1562 (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

Here, in evaluating the Plaintiff's subjective symptomatology, the ALJ found the Plaintiff's complaints of pain and limitations were not credible. (Tr. 24-25). Throughout his decision, the ALJ discussed in great detail his reasoning for discounting the Plaintiff's allegations and purported functional limitations. The ALJ throughly reviewed the medical records and also considered the Plaintiff's demeanor at the hearing. The ALJ summarizes several specific reasons as follows:

I find that the subjective complaints of pain are not viable for the following reasons:

1. At Exhibit 35 in January 2005, the claimant's pain specialist, Dr. Arnold, states "she is completely non-compliant" and "her psychological overlay was gigantic", yet he also said her affect was not significant for depression or anxiety. Surely, if her pain was that severe she would have been compliant.

2. All objective test results were very "mild". In Exhibit 8F a MRI of the cervical spine noted mild left foraminal stenosis at C6-7 due to minimal osteophytic process.

3. In Exhibit 8F, a full examination by a pain specialist showed normal gait with good heel to toe walking.

4. At Exhibit 11F, she goes to the emergency room for left knee pain. They note she is not in distress and sitting comfortably in the examination room.

5. At Exhibit 17F, she asserts she lost thirty-six tablets of Oxycontin in the sink and asks for more. At Exhibit 8F, Dr. Issacson notes as part of his diagnosis "narcotic tolerance". It appears that her subjective complaints of pain are influenced to some degree on her drug seeking behavior.

6. At Exhibit 19F, DDS consultant Dr. Lalla notes power in upper extremity was 4/5 and fine manual dexterity was normal. She was able to walk thirty feet without difficulty.

7. At Exhibit 32 F, she sees a chiropractor from January 2004 to December 2004 and each time she complains of pain in a different part of her body.

8. At Exhibit 35F, a pain specialist says "patient is able to perform all the normal activities of daily living without difficulty". He also noted her appearance was bright and relaxed.

9. At the hearing, Ms. Vandermeulen testified she has a six and ten year old child at

27

home to care for.

10.   The claimant was able to remember all her doctor's names and medication admitting to side effects.  She claimed without medications her pain was at a "12" and with medications at "7" on a scale of "10".  I find that is simply not credible given her appearance at the hearing.  (Tr. 27).

Clearly, the Plaintiff's medical records, demeanor and testimony did not paint a convincing picture of disabling pain.

The ALJ also addresses the Plaintiff's "generalized joint pain".  (Tr. 25).  The ALJ noted the problem was diagnosed as fibromyalgia because most objective tests were negative.  (Tr. 25).  He points to treatment notes from Dr. Cossu from November 2000 which show a positive ANA but nothing else thereafter.  (Tr. 25).  The ALJ also refers to treatment notes from Dr. Issacson which show normal examination and a diagnosis of myofacial overlay with no narcotics prescribed. (Tr. 25, 247-255).

In addition to the medical records, the ALJ also points to the fact the Plaintiff cares for two small children on a daily basis.  While the performance of everyday tasks cannot be used to make a determination the Plaintiff was not disabled, daily activities can be used as a measure of the Plaintiff's credibility in regard to his ability to perform certain tasks.  *See* Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005) (noting that the ALJ properly discredited a treating physicians testimony by pointing out the contrasts in the claimants daily activities and the physicians diagnosis); Wilson v. Barnhart, 284 F.3d 1219, 1226 (11th Cir. 2002) (upholding the ALJ's finding that the claimant's allegations of disabling pain were not credible because of her daily activities demonstrated otherwise).  *See* Norris v. Heckler, 760 1154, 1158 (11th Cir. 1985) (holding that an ALJ may consider the plaintiff's demeanor when making a credibility determination); SSR 96-7p (the inconsistency of the

Plaintiff's own statements with information contained in the record bears upon her credibility).

In sum, the ALJ held the Plaintiff's subjective complaints were not credible because the Plaintiff's manner and demeanor failed to convey convincing credibility, the Plaintiff's daily activities did not support her claims, and the medical evidence did not support the claim of disabling pain.   It is clear from the ALJ's decision he clearly articulated this credibility finding with substantial supporting evidence in the record.

### (4)Whether the ALJ Posed an Adequate Hypothetical Question to the Vocational Expert

In the Plaintiff's second and third argument, she briefly states the hypothetical question posed to the vocational expert was inadequate.   Hypothetical questions asked by the ALJ to the vocational expert must describe comprehensively the claimant's impairments. Loveless vs. Massanari, 136 F.Supp.2d 1245, 1250 (M.D. Ala. 2001) (citing Pendley v. Heckler, 767 F.2d 1561, 1652 (11th Cir. 1985) (per curiam)).   If the hypothetical question upon which the vocational expert bases his evaluation does not assume all of a claimant's impairments, the decision of the ALJ denying a claimant's applications for disability insurance benefits, which is based significantly on the expert testimony, is not supported by substantial evidence.   Loveless, 136 F.Supp.2d at 1250. Notwithstanding, the foregoing general standard, the hypothetical question posed by the ALJ may omit non-severe impairments.   Id.

As previously noted, the ALJ properly assessed the Plaintiff's RFC of sedentary work with certain physical and mental limitations.  (Tr. 27, 65).  The ALJ then found the Plaintiff could not return to any of her past relevant work.  (Tr. 28).  At this point, a finding of "not disabled" would be directed by the Medical-Vocational Guidelines, however, the Plaintiff's ability to perform all or substantially all of the requirements of sedentary work was impeded by additional exertional and/or

non-exertional impairments.  Therefore, an impartial vocational expert was called to help determine whether there are a significant number of jobs in the national economy that the Plaintiff can perform given her RFC.  (Tr. 29).

After discussing the Plaintiff previous employment and the exertional levels assigned by the Dictionary of Occupational Titles (DOT), the ALJ posed the following hypothetical question to the vocational expert:

> Assume that individual is the same age, education, and work experience as the claimant, has the following residual functional capacity.  Capable of sedentary work with a sit/stand option; an occasional imitation for bending, stooping, crouching, and kneeling, and occasional limitation for prolonged standing. She further has an occasional limitation for concentrating on tasks assigned and coping with work stress but capable of performing simple, routine, repetitive tasks.  Are there any jobs? (Tr. 65).

The VE responded by stating that given the parameters outlined by the ALJ, the Plaintiff would be capable of performing clerical, unskilled work.  (Tr. 65).  Although the Plaintiff argues the ALJ did not adequately reflect all the Plaintiff's physical and psychological limitations, it is clear that is incorrect.  It is already established the ALJ properly considered the examining and treating physicians, properly conducted a credibility analysis, and concluded the Plaintiff's RFC including any exertional and non-exertional limitations.  These limitations were adequately reflected in the hypothetical question, therefore, the testimony of the VE can be relied upon as substantial evidence.

Accordingly it is hereby

**RESPECTFULLY RECOMMENDED:**

The Decision of the Commissioner should be **AFFIRMED.**

**Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved**

**party from attacking the factual findings on appeal.**

**DONE AND ORDERED** at Fort Myers, Florida, this ___13th___ day of July, 2007.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies:  Counsel of record, MJCD